**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Criminal Case No. 11-cr-00481-CMA

UNITED STATES OF AMERICA,

      Plaintiff,

v.

THOMAS B. EVANS,

      Defendant.

---

**ORDER DENYING MOTION TO CONTINUE SENTENCING HEARING**

---

This matter is before the Court on Defendant Thomas B. Evans' Motion to

Continue Sentencing Hearing (Doc. # 52), filed on November 20, 2012.  For the

following reasons, Defendant's Motion is denied.[1]

## I.  BACKGROUND

On January 20, 2012, Defendant pleaded guilty to one count of conspiracy to

commit mail and wire fraud, in violation of 18 U.S.C. § 1349.  The parties agree to

the following facts, which are taken from paragraph 13 of  the Plea Agreement.

(Doc. # 15.)

Between at least May 2003 and April 2007, Defendant was a property manager

and organizer of real estate funds, and he was the owner and President of Evans Real

---

[1]  The Court has already denied the instant motion by text entry.  (Doc. # 55.)  This
written order explains why the Court has denied Defendant's motion.

Estate Group, LLC ("Evans Real Estate Group").  From May 2003 until August 2005,

Evans Real Estate Group solicited investors to invest in the acquisition, renovation, and

operation of apartment complex located in the state of Texas through the Garden Stone

Apartments, LP; Ventana Apartments, LP; and Aspen Chase Investments, LP

(collectively, "the Apartment Properties").  Defendant solicited investors through a

Confidential Offering Disclosure Statement that stated, among other things, the

anticipated uses of investor proceeds.  Defendant misappropriated each project's funds

to pay operating expenses of other projects and made hundreds of transfers to and

from various bank accounts associated with the projects, as well as his own bank

accounts.

Defendant also owned and operated a property management services company

that provided services to the Apartment Properties.  Co-conspirator 1 ("CC-1") was an

employee of Defendant's property management company.  Between at least April 2005

and 2007 – the duration of the charged conspiracy – CC-1 prepared financial state-

ments for Defendant's properties in an electronic accounting system.  At Defendant's

direction, CC-1 would send monthly financial statements to Defendant for his review,

and Defendant would indicate on those statements the changes that he wanted CC-1 to

make.  These changes included recharacterizing expenses and deposits, and changing

gross potential rent, vacancy rates, delinquency rates, and renewal concessions.  CC-1

would make the changes which, in turn, would have the effect of falsely stating the net

rental income, total operating revenue, total operating expenses, and net income/loss

on the project financial statements.  At Defendant's direction, CC-1 would also make changes to journal entries in the electronic accounting system so that the monthly financial statements generated from that system would falsely reflect greater gross potential rent; rental income and occupancy rates; lower vacancy and delinquency rates; and fewer renewal concessions than were actually true.  After CC-1 printed out the falsified monthly financial statements, CC-1 changed those entries back so that they would reflect accurate information in the electronic accounting system.

Defendant then provided the falsified monthly financial statements for the previous quarter to investors in the Apartment Properties, without informing the investors that they contained false information.  Defendant also mailed letters to investors in the Apartment Properties that misrepresented the progress of apartment property renovations and apartment occupancy rates.  Defendant also directed CC-1 to send the falsified monthly financial statements to lending institutions, without informing the lending institutions that they contained false information.

In April 2007, Defendant and his property management company were removed as the property manager for the Apartment Properties, and an appointed receiver took control of the projects and the handling of property management.  Defendant and CC-1 provided access to the electronic accounting system, including the falsified financial statements, to the appointed receiver for the properties without informing the receiver of the falsity of the information contained therein.

3

In the Plea Agreement, the Government asserted that the fraud perpetrated by Defendant and CC-1 caused investors to lose approximately $9.7 million.  The Government now asserts that it will present evidence at the sentencing hearing that Defendant solicited $16 million from approximately 65 investors, and distributed approximately $4 million back to those investors, for a total loss to the investors of approximately $12 million.  (Doc. # 54 at 4.)  The Government also asserts that it will present evidence at the sentencing hearing that the Apartment Properties have all  been foreclosed.  (*Id.*)

The Court originally set a sentencing hearing for August 14, 2012, which was then reset for January 15, 2013.  (Doc. # 26.)  On September 16, 2012, the current counsel for Defendant was appointed.  (Doc. # 43.)  The instant motion for a continuance of the sentencing hearing was filed on November 20, 2012, and the Government responded on November 30, 2012.  (Doc. ## 52, 54.)

## II.  ANALYSIS

United States Sentencing Guideline § 2B1.1 governs sentencing for the offense of conspiracy to commit wire fraud and mail fraud.  The most consequential determination a district court makes when sentencing a defendant under this Guideline is the amount of loss caused by the defendant's crime.  *See* U.S.S.G. § 2B1.1(b)(1) (this factor can increase the adjusted offense level by 0 to 30 points, depending on the amount of loss).  Thus, it is no surprise that Defendant disputes the Government's assertion that the amount of loss was $12 million.  Pursuant to Application Note 3(A),

"loss is the greater of actual loss or intended loss."[2]  "Actual loss" means "the

reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G.

§ 2B1.1, App. Note 3(A)(i).  In turn, "reasonably foreseeable pecuniary harm" is defined

as "pecuniary harm that the defendant knew or, under the circumstances, reasonably

should have known, was a potential result of the offense."  *Id.* (iii).  Thus, the

Government must prove that the actual loss suffered by the investors as a result

of Defendant's fraud was reasonably foreseeable to Defendant.

Defendant contends that the Court should employ the loss analysis framework

set forth in cases like *United States v. Nacchio*, 573 F.3d 1062 (10th Cir. 2009) and

*United States v. Olis*, 429 F.3d 540 (5th Cir. 2005).  Under this approach, courts

exclude unrelated market factors in order to determine the gain a defendant received

from any misrepresentations.  *See Nacchio*, 574 F.3d at 1074.  Thus, courts "must

undertake 'thorough analyses grounded in economic reality.'" *Nacchio*, 573 F.3d at

1087 (quoting *Olis*, 429 F.3d at 547).  In this case, Defendant appears to argue that

market factors unrelated to Defendant's misrepresentations caused the loss suffered by

the investors.  Thus, Defendant's counsel requests additional time to investigate actions

taken by the receiver, as well as the condition of the commercial real estate market

in Texas during the applicable time period.  (Doc. # 52 at 4.)  The Court finds that

continuance is not warranted for these reasons because, as is explained below, the

---

[2]  As there is no suggestion that Defendant intended any greater loss, the Court looks only to the actual loss.

fruits of such investigation would be irrelevant to determining the "actual loss" suffered by the investors.

The Court disagrees with Defendant that the framework set forth in *Nacchio* should be employed to determine the "actual loss" in this case. Defendant does not cite any case law supporting the proposition that the *Nacchio* framework applies outside the context of a securities fraud prosecution, and the Court finds that the *Nacchio* analysis does not apply to the facts of this case.[3]

First, as Defendant seems to recognize, *Nacchio* was decided in the context of an insider trading case. As such, the district court's task in *Nacchio* was to determine "the gain resulting from the offense," not the "loss to victims." *Nacchio*, 573 F.3d at 1079. In marked contrast, the Court's task in this case is to determine the loss to the victims, *i.e.*, the investors who were duped into investing in the Apartment Properties. Application Note 3.B to U.S.S.G. § 2B1.1 provides that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." Thus, unlike in *Nacchio*, the Court's analysis is focused on the loss suffered by the victims, rather than any gain received by Defendant. Furthermore, *Nacchio* concerns the impact of a defendant's misrepresentations on the fluctuating stock prices of publicly-traded stocks. In that context, it is

---

[3] In his Motion, Defendant argues that the facts of this case "lend themselves to a loss calculation more similar to a securities fraud prosecution than to a mortgage or bank fraud persecution." (Doc. # 52 at 3.) Defendant presents this argument as if it is self-evident, citing no authority in support, nor offering any explanation for his conclusory assertion.

impossible to identify the victims and to quantify their losses. *See Nacchio*, 573 F.3d at 1079 (quoting former U.S.S.G. § 2F1.2 App. Note background) ("Because the victims and their losses are difficult if not impossible to identify, the gain . . . by the defendant . . . is employed instead of the victims' losses."). In this context, it is no arduous task to identify the victims; they are those who invested in Defendant's companies. Nor is it difficult to identify their losses – it was the amount they invested less the amount that was repaid. *See United States v. Turk*, 626 F.3d 743, 748 (2d Cir. 2010) (the victims' "loss is the principal value of the loans they made . . . which were never repaid.").

Defendant argues that any calculation of loss should account for an unexpected decline in the housing market as well as actions taken by the receiver. Even assuming *arguendo* that these factors were partially responsible for the eventual bankruptcy of the Apartment Properties, the Second Circuit recently addressed a similar argument by a criminal defendant and held that "the decline in value in any purported collateral need not have been foreseeable to [Defendant] in order for [him] to be held accountable for that entire loss." *Turk*, 626 F.3d at 749. Thus, the only loss that needs to be foreseeable under U.S.S.G. § 2B1.1 is the loss of the unpaid principal. *Id.* This approach is necessary to ensure that defendants who fraudulently induce investors to assume the risk of investing in their companies are responsible for the natural consequences of their fraudulent conduct. *See United States v. Mallory*, 709 F. Supp. 2d 455, 459 (E.D. Va. 2010). One natural and foreseeable consequence of making

fraudulent misrepresentations to investors is that the investors may lose the principal

that they originally invested. *See Turk*, 626 F.3d at 750 ("the Guideline does not hold

defendants accountable only for certain or near-certain losses, but for losses that were

reasonably foreseeable pecuniary harm.").

Had Defendant made his fraudulent statements at a less volatile economic time,

it is of course possible that those who invested in the Apartment Properties would have

broken even or perhaps turned a profit. But to accept Defendant's argument that the

Court should account for the economic climate or any actions taken by the receiver, is

"to encourage would-be fraudsters to roll the dice on the chips of others, assuming all

the upside benefit and little of the downside risk." *Turk*, 626 F.3d at 750. A potential

result of making fraudulent statements to induce investments, or of making fraudulent

statements to calm the nerves of jumpy investors, is that the investors might lose their

investment. Thus, the Court finds that the loss of the principal investment (less any

proceeds that were paid back) was "reasonably foreseeable" to Defendant for purposes

of calculating "actual loss." U.S.S.G. § 2B1.1, App. Note 3(A)(iv).

## III.  <u>CONCLUSION</u>

Based on the foregoing, the Court rejects Defendant's contention that the

Court should employ the *Nacchio* approach in calculating "actual loss." Thus, it is

unnecessary for Defendant to undertake much of the time-consuming investigation that

he describes in his motion.  It is therefore ORDERED that Defendant's Motion to

Continue Sentencing Hearing (Doc. # 52) is DENIED.

DATED:  December __11__, 2012

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge